UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-CR-20804-SINGHAL

UNITED STATES OF AMERICA

vs.

ASHLEIGH HOLLOWAY,

    **Defendant.**
    _____/

**UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO
DEFENDANT'S MOTION FOR SEVERANCE**

The United States of America, by and through the undersigned Assistant United States Attorneys, hereby files this Response in Opposition to Defendant Ashleigh Holloway's Motion to Sever Defendant [DE 50]. In the Motion, Defendant Holloway states that the Court should permit her to proceed to trial separately because "the testimonies of remainder of defendants [may] exculpate" the Defendant, and, due to the risk of a "prejudicial spillover effect." *See* Mot. To Sever, at 3 [DE 50]. The United States respectfully submits that the Defendant's Motion should be denied for the following reasons.

**I.    FACTUAL BACKGROUND**

    **A. History and Background of the Investigation**

        *a. Victim 1 and Victim 2*

This investigation began in or around 2017, when law enforcement made contact with Victim 1 and Victim 2 who both reported being commercially sex trafficked by Foster. Victim 1 reported being recruited into Foster's organization in or around August 2007 as a minor, and being commercially sex trafficked by Foster both as a minor, and then as an adult, through approximately

May 2010. Victim 1 reported that, during this time period, she was moved across state lines for purposes of prostitution. Victim 1 further reported that she engaged in sex with Foster on numerous occasions, beginning when she was a minor.

Victim 2 similarly reported being recruited into Foster's organization in or around May 2004, as a minor. Victim 2 reported being commercially sex trafficked by Foster from approximately 2004 through 2011. Victim 2 also reported that she was moved across state lines for purposes of prostitution. Victim 2 reported that she engaged in sex with Foster on numerous occasions, beginning when she was a minor.

Victim 1 reported that she was recruited into Foster's organization out of high school while in foster care. Victim 2 reported that she was recruited into Foster's organization after being kidnapped by a violent pimp. Both girls were vulnerable females recruited to live with, have sex with, and work for, Foster. They both moved into his residence—a residence that he shared at any given time with five to fifteen other females who also lived with, and worked for, Foster. Foster put these females on diets, including a diet referred to as the "lemon diet," which is essentially a juice cleanse, and arranged for cosmetic surgeries on their behalf so that they could make more money for him. These girls were also put on anti-depressant medication and mood stabilizers by Foster.

Both of these females reported that they were sold the same false dream—that if they worked hard enough they would make money with Foster through investments and be able to retire early. Based upon this false dream, Victim 1 and Victim 2 reported that they turned over the profits that they made every night while working at exotic dance venues and engaging in prostitution to Foster or women within Foster's organization, anointed his "main girls," with the belief that the money that the victims were making selling their bodies would be used to benefit them in the

future.[1]  This was false and when both victims eventually got up the strength to leave Foster, they left with none of the earnings they had made after years of working for him.

At some point between 2014 and 2016, Victim 2 moved back into Foster's residence for approximately three (3) weeks to a month.  While living with Foster, Victim 2 observed that Hanah Chan and Ashleigh Holloway were Foster's main girls and that the patterns and routines of the females were the same as when Victim 2 had previously resided with Foster.

    b.  *Victim 3*

In or around mid-August 2019, Holloway recruited Victim 3, an adult female, into Foster, Chan, and Holloway's sex trafficking organization.  Victim 3 met Holloway at a nightclub in Broward County, Florida, at which time Holloway provided Victim 3 with her telephone number.  Victim 3 is a recovering addict.  Approximately one week after meeting Holloway, Victim 3 contacted Holloway and they made plans to meet up.  Holloway picked up Victim 3 at her residence and they went to an exotic dance venue in Hallandale Beach, Florida.  While there, Holloway introduced Victim 3 to Foster.  Victim 3 informed Holloway and Foster of her current living situation, which she described as dysfunctional.  In response, Holloway and Foster advised Victim 3 that she should leave and move in with them.  Foster told Victim 3 that he would help Victim 3 get back on her feet.  Holloway explained to Victim 3 that she would live with other girls and that they all made a lot of money by working as dancers and investing in companies.  Foster told Victim 3 that she would be a great fit with the other girls and that she would make a lot of money with the investments.  Holloway never told Victim 3 that she would be required to engage in commercial sex if she began to live with the group.

---

[1] The term "main girls" used in the context of this investigation is essentially the same as the term "bottom" commonly used to refer to women in supervisory roles within a sex trafficking organization.

3

Upon departing from the exotic dance venue, Holloway drove Victim 3 to get her belongings and brought Victim 3 to a residence located at 2941 Angler Drive, in Delray, Florida (hereafter referred to as the "Angler Residence"). Soon after Victim 3 arrived, Foster came to pick up Victim 3 and drove her to another residence associated with Foster, located at 4630 Sherwood Forest Drive, in Delray Beach, Florida (hereinafter referred to as the "Sherwood Forest Residence"), which Foster identified as his own residence. Victim 3 had sexual intercourse with Foster during that initial meeting at the Sherwood Forest residence. This investigation has revealed that having sex with Foster is a sort of initiation requirement to becoming a part of the sex trafficking organization. Foster then drove Victim 3 back to the Angler residence where she resided until travelling to Detroit, Michigan.

The next morning, Victim 3 was told by Foster and by Holloway that she needed to go on the lemon diet and lose weight if she wanted to get the cosmetic surgeries that Foster would provide.

While Victim 3 was residing at the Angler residence she learned that the other females that resided there, aside from Chan, engaged in commercial sex at the exotic dance venues where they worked. Victim 3 continued to reside at the Angler residence, occasionally making trips to the Sherwood Forest residence to see Foster until, at the direction of Foster, Victim 3, and six other females residing at three different residences in Delray Beach associated with the defendants, travelled to Detroit, Michigan. Foster advised the females that, due to the impending hurricane in or around early September 2019, the females would not be able to earn enough money in Florida and therefore had to go to Detroit to make money. Chan booked Victim 3's ticket and Chan and Foster drove Victim 3 and two other females to their flight out of Fort Lauderdale-Hollywood International Airport to Detroit, Michigan on September 4, 2019.

Upon arrival in Detroit, Victim 3 was told by Foster and other females in Foster's organization that she would have to engage in commercial sex. Victim 3 was told to work at an exotic dance venue and engage in sex with clients. While Foster, Holloway, and Chan did not make the trip to Detroit with Victim 3 and the other females, Victim 3 advised that while in Detroit, not only did she speak to Foster, she spoke to Holloway as well, and both Foster and Holloway advised Victim 3 that she would have to engage in sex with clients in order to make more money. Victim 3 also overheard a conversation between Foster and one of the other females in Detroit, where Foster was telling the female not to let Victim 3 leave Detroit until she earned enough money to reimburse the cost for her flight, hotel, and expenses.

While in Detroit, Victim 3 reported that the other six females engaged in commercial sex. Every night, the females had to provide all of their earnings to one of the females who would then deposit the money into the bank the following day. The group of females had a financial goal to meet before they were able to return to Miami, Florida.

On or about September 5, 2019, Victim 3 contacted the National Human Trafficking Hotline through POLARIS, requesting emergency extraction from a hotel located in Romulus, Michigan. In response to the call, law enforcement made contact with Victim 3 at the hotel. Victim 3 reported at that time that she was being pressured to engage in commercial sex by Foster and his organization and she did not want to do so. Victim 3 reported that she had wanted to leave, but was told that she could not leave because the females that she travelled with from Florida to Detroit had not met their financial goal.

In subsequent discussions with law enforcement, Victim 3 advised law enforcement that Chan and Holloway were in charge under Foster. Chan appeared to handle the money side of the business and Holloway served as a recruiter and would often check in on the girls living in the

5

houses. In fact, according to Victim 3, Holloway would make sure that the females took their medication, which included bi-polar medication and mood stabilizers.

    c. *Airport Search*

Furthermore, on October 23, 2019, a female associated with Foster's organization, who had previously been in Detroit with Victim 3, arrived at Miami International Airport aboard a flight from Colombia. This female was selected by Customs and Border Protection for secondary examination. During the course of the examination, law enforcement interviewed the female who advised that she had traveled to Colombia to undergo cosmetic surgery, specifically gastric bypass surgery, which was funded by Holloway and Chan. A cursory review of the female's phone revealed communications indicative of prostitution. Law enforcement also found a group chat on WhatsApp titled "POW,"[2] which included Holloway, Chan, and Foster, among other females, and in which Foster had sent the link to a website for www.fosterscareinc.com, which will be discussed in more detail *infra* at pages 8-9.

    d. *Search Warrants*

On November 14, 2019, three residential search warrants were executed on residences in Delray Beach. Foster, his brother, and one other female were discovered at the Sherwood Forest Residence. Chan purchased this property on May 16, 2019. A review of the homeowner application to the Homeowner's Association for the Sherwood Forest Residence listed Chan and Holloway as the applicants for the residence.

Another search warrant was executed at a residence located at the Angler Residence. There, multiple females were found, including Holloway and Chan.

---

[2] Law enforcement has learned during the course of this investigation that a female initially came up with the name "POW" to stand for "Property of Will." However, it is now used by the females associated with Foster to mean "Power of Women."

A final search warrant was executed at a residence located at 4724 Franwood Drive, in Delray Beach, Florida (hereinafter referred to as the "Franwood Residence"). More females were found at this location. A public records search of the Franwood Residence revealed that MTN Doo. Logistics, LLC, a company that Holloway is a part of and that will be discussed more *infra* at page 8, purchased the property on June 10, 2019. Each of these residences were used to further the sex trafficking organization's operations.

B. **Holloway's Role Within the Organization**

Through this investigation, law enforcement has learned that Holloway joined Foster's organization in or around 2007 or 2008. While Holloway initially worked at exotic dance venues engaging in prostitution for Foster, she evolved over time into one of his main girls and one of the mangers of his organization, and no longer engaged in prostitution on Foster's behalf. From interviewing victims in this case, law enforcement has learned that once Holloway became a main girl, she acted as a recruiter for the organization and played the role of mother of the house for Foster by teaching the girls how to finesse prostitution clients, how to ask for money, and how to dress and do their makeup. This is further evidenced by Holloway's recruitment of Victim 3.

Again, Foster defrauded the victims, in part, by telling the victims that the money that they made every night was going toward various "investments," including a clothing line that sold exotic dance clothing, for example, and that these businesses would ultimately benefit the females by allowing them to make a lot of money and retire at an early age.

Holloway is on a number of the corporate records for the businesses associated with Foster. Holloway was, for example, listed as registered agent for a company called Live!, LLC in 2012. The corresponding bank records obtained in connection with the account list Holloway as a member of Live!, LLC, Chan is listed as a member, and Foster is listed as a "signer to be added later."

7

Holloway is similarly listed on the corporate records for Taboo Retail, LLC beginning as early as 2011 as a "managing member," along with Foster and Chan. This business did not close until 2017. Foster, Holloway, and Chan are listed as the signors on the bank accounts for Taboo Retail beginning in 2011 and continuing through the closure of the bank accounts in 2017. Between 2013 and 2017, one of the Taboo Retail accounts that Holloway was a signor on received over $500,000 in cash deposits, which is consistent with victim reporting that the cash that the girls turned over every night from their dancing and prostitution would be deposited into accounts controlled by the defendants.

Another business, MTN DOO Logistics LLC was incorporated in Florida, Nevada, and Connecticut. A review of records from the Florida Department of State, Division of Corporations revealed that MTN DOO Logistics, LLC was incorporated on January 2, 2018. As of November 2019, the manager of MTN Doo Logistics, LLC was listed as Foster, and the current authorized members included Holloway and Chan. The principal business address listed for the business was Angler Residence. As previously mentioned, MTN Doo Logistics, LLC was used to purchase the Franwood Residence.

Holloway is also listed, along with Chan and Foster, on the "Foster's Care, Inc." business records. This business was incorporated in Florida as a not-for-profit in 2014. The stated purpose of the corporation, according to the business records, was to provide social services, counseling, shelter, and education to youth and young adults. Holloway was listed as the Vice President of Foster's Care, Inc. This business was subsequently dissolved, but it served as a the precursor to a website recently discovered by law enforcement—www.fosterscareinc.com This website, that shares the same namesake as the corporation that Holloway was a part of, purported to provide free services, to include housing, therapy, medical treatment, and job training, to victims of sex

trafficking. The website further stated that it worked "in partnership with police and FBI" to serve 140 women. In a post-*Miranda* interview, Foster admitted that he had this website designed.

## II. PROCEDURAL HISTORY

On December 5, 2019, the Indictment against Foster, Holloway, and Chan was ordered unsealed. [DE 14, 16]. The Indictment charges six counts broken down as follows:

1. In Count 1, Foster is charged with a sex trafficking conspiracy. This count states that Foster combined, conspired, and agreed "with others known and unknown to the Grand Jury" to knowingly recruit, entice, harbor, transport, provide, and obtain by any means, a person, knowing that force, fraud, and coercion, would be used to cause such person to engage in a commercial sex act, and knowing that a person had not attained the agent of eighteen and would be caused to engage in a commercial sex act, in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), and (b)(2), all in violation of Title 18, United States Code, Section 1594(c)."

2. Count 2 charges Foster with sex trafficking Victim 1 as a minor, and by force, fraud, and coercion in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(1), and (b)(2) and 2.

3. Count 3 charges Foster with sex trafficking Victim 1 by force, fraud, and coercion in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1) and 2.

4. Count 4 charges Foster with sex trafficking Victim 2 by force, fraud, and coercion in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1) and 2.

5. Count 5 charges Foster, Holloway, and Chan with sex trafficking Victim 3 by fraud and coercion, in violation of Title 18, United States Code, Sections 1591(a)(1) and (b)(1) and 2.

      6.    Count 6 charges Foster and Chan with transportation of Victim 3 for prostitution, in violation of Title 18, United States Code, Sections 2421 and 2.

Chan and Holloway were arrested on December 9, 2019 and trial was initially set for February 18, 2020. [DE 23, 25, 44]. Foster, Holloway, and Chan jointly moved for a 90-day continuance of the trial date on January 23, 2020. [DE 53]. The trial is now scheduled for all three defendants for the two-week period beginning April 13, 2020. [DE 54].

### III.    LEGAL STANDARD

Federal Rule of Criminal Procedure 8(b) provides that multiple defendants may be joined in an Indictment "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 8(b) further specifies that the "defendants may be charged in one or more counts together or separately," and that each defendant does not have to be charged in every count of the Indictment.

The Eleventh Circuit has repeatedly held that "the rule about joint trials is that 'defendants who are indicted together are usually tried together.'" *United States v. Lopez*, 649 F.3d 1222, 1234 (11th Cir. 2011) (quoting *United States v. Browne*, 505 F.3d 1229, 1268 (11th Cir. 2007)); *see also, e.g.*, *Zafiro v. United States,* 506 U.S. 534, 537–38 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together."); *United States v. Magdaniel–Mora,* 746 F.2d 715, 718 (11th Cir. 1984) ("To repeat the familiar, persons indicted together ordinarily should be tried together."). This strong preference for joint trials is based on the fact that "[j]oint trials play a vital role in the criminal justice system and serve important interests: they reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." *Lopez*, 649 F.3d at 1233. Similarly, as the Supreme Court has observed, "[i]t would impair both the efficiency and the fairness of the criminal justice system to require . . . that

prosecutors bring separate proceedings, presenting the same evidence again and again, requiring victims and witnesses to repeat the inconvenience (and sometimes trauma) of testifying, and randomly favoring the last-tried defendant who have the advantage of knowing the prosecution's case beforehand." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987).

Federal Rule of Criminal Procedure 14 permits a district court to "sever the defendants' trials, or provide any other relief that justice requires" if a joint trial "appears to prejudice a defendant or the government." However, the Eleventh Circuit has made clear that "[t]he exceptional circumstances justifying a deviation from the rule" that defendants who are indicted together should be tried together "are few and far between." *Lopez*, 649 F.3d at 1234. Severance is only proper where denial would cause "compelling prejudice against which the district court [can] offer[] no protection." *United States v. Dowd*, 451 F.3d 1244, 1249 (11th Cir. 2006) (citations omitted) (regarding severance of counts); *see also, e.g.*, *United States v. Acosta*, No. 12-20157-CR, 2012 WL 3887534, at *3-5 (S.D. Fla. Sept. 7, 2012) (Rosenbaum, D.J.) (unpublished) (denying severance where charges purported to involve related proof, defendant failed to articulate and show prejudice, and based upon public interest).

In order to justify a severance under Rule 14, the Defendant must first "carry the 'heavy burden of demonstrating that compelling prejudice would result' from a joint trial." *Lopez,* 649 F.3d at 1234 (quoting *Browne*, 505 F.3d at 1268 (alteration adopted)). "To show compelling prejudice, a defendant must establish that a joint trial would actually prejudice the defendant and that a severance is the only proper remedy for that prejudice – jury instructions or some other remedy short of severance will not work." *Id.* However, "not just any kind of prejudice will do"– a defendant seeking a severance must establish "a serious risk that a joint trial would either 'compromise a specific trial right of one of the defendants' or 'prevent the jury from making a reliable judgment about guilt or innocence' even if limiting instructions are given." *Id.* at 1234-

11

1235 (quoting *United States v. Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005)). "Aside from those two situations, jointly indicted defendants are not entitled to a severance." *Id.*

## IV. ANALYSIS

The charges against Holloway, Foster, and Chan are properly joined under Rule 8(b) because the defendants are alleged to have "participated in the same act or transaction" charged in Count 5, at a minimum, related to Victim 3. *See* Fed. R. Crim. P. 8(b). A joint trial of the defendants in this case is appropriate because it will "reduce the risk of inconsistent verdicts and the unfairness inherent in serial trials, lighten the burden on victims and witnesses, increase efficiency, and conserve scarce judicial resources." *See Lopez*, 649 F.3d at 1234. That assessment is particularly appropriate in this case where the defendants worked together in order to sex traffic Victim 3. Holloway recruited Victim 3, introduced Victim 3 to Foster, and moved her into the house that Chan lived in. Holloway kept in touch with Victim 3 as she dieted and after she went to Detroit, Michigan, at the direction of Foster, on a flight paid for by Chan. Holloway, Foster, and Chan worked together to recruit, entice, and obtain Victim 3. To try the defendants separately based on intertwined and overlapping conduct would risk inconsistent verdicts and give rise to the unfairness inherent in serial trials.

Furthermore, this is a sex trafficking case. The victims who will testify in this case have been deeply traumatized due to their involvement with Foster, Holloway, and Chan. Victim 3, for example, is a recovering addict, who will have to testify at trial about her experience with Foster, Holloway, and Chan. To ask her to testify more than once will perpetuate her trauma and is entirely unwarranted and unsupported by the motion filed by Holloway. *See, e.g.*, *Richardson*, 481 U.S. at 210 (noting the trauma caused to victims of having to testify more than once).

Additionally, the Government anticipates that this trial will be lengthy, even if Holloway is severed from the instant case. The discovery in this case, as outlined in the defendants' Motion

for a Continuance, is voluminous. [DE 53]. As to Count 5 alone it includes, but is not limited to, cellular phone evidence; social media evidence; investigative and interview reports; travel records; bank records; and photographs. The trial on Count 5 alone would necessitate the travel of witnesses from out of state, including, at a minimum, law enforcement officers and potential witnesses located in Detroit, Michigan, and the sex trafficking expert witness obtained by the Government. [DE 52]. A joint trial would serve the purpose of lightening the burden on these victims and witnesses, increasing efficiency, and conserving scarce judicial resources.

The Defendant argues that the Court should sever her case and allow her to be tried separately from his codefendants for two reasons. According to defense counsel, (1) not only "*may* the testimonies of remainder of defendants exculpate Ms. Holloway if presented in a separate trial as to count five," but (2) there is a risk of prejudicial spillover effect that is "*likely*" to prevent the jury from making individualized determinations as to each defendant. *See* Mot., at 3 (emphasis added). Both of these reasons are stated in vague and speculative terms—the defendant "*may*" be exculpated by her co-defendants at a separate trial, it is "*likely*" that there will be a prejudicial spillover effect from a joint trial, however, neither of these highly speculative and hypothetical arguments meet the standard for severance, which requires the defendant to bear the burden of proving that a "joint trial would *actually* prejudice the defendant and that a severance is the only proper remedy for the prejudice." *See Browne*, 505 F.3d at 1268 (emphasis added); *see also United States v. Acosta*, 2010 WL 3887534, *4 (S.D. Fla. Sept. 7, 2012) (finding that Defendant's "assertion without elaboration that he and his Co-defendants may rely on mutually antagonistic defense and inculpatory evidence will be admitted against Co-defendants that is not admissible against the Defendant . . . without identifying what defense or evidence might be problematic are insufficient to justify a severance, particularly because [the defendant] bears the burden of establishing compelling prejudice justifying a severance.")

13

The Defendant does not expand upon how the testimony of her co-defendants would "exculpate" her at a separate trial and so it is difficult for the Government to address this conclusory argument that is conspicuously lacking in detail. However, at this time, the Government does not possess information or statements from either Chan or Foster exculpating Holloway from the indicted conduct in this case. This vague and speculative statement cannot possibly establish the type of "compelling prejudice" that the Eleventh Circuit requires in order to justify a severance.

Finally, Defendant Holloway raises a concern that she may be prejudiced by the presentation of evidence that goes beyond the relatively short time period at issue in Count 5. However, what Defendant Holloway fails to grasp is that, while Holloway is only charged in Count 5 of the Indictment related to Victim 3, she is an unindicted co-conspirator in the conspiracy charged in Count 1. Further, as the undersigned has explained to defense counsel, the Government has plans to supersede the initial indictment in this case, and if that happens, Holloway can, and likely will, be named as a co-conspirator in Count 1. *See Lopez*, 649 F.3d at 1234 ("That rule [that defendants who are indicted together are usually tried together] is even more pronounced in conspiracy cases where the refrain is that 'defendants charged with a common conspiracy should be tried together.'") (quoting *United States v. Beale*, 921 F.2d 1412, 1428 (11th Cir. 1991). Count 1 spans from 2008 (when 18 U.S.C. § 1594 was enacted into law) to September 2019. Thus, not only will evidence over this period of time be admitted as to Defendant Foster, it will also be admitted to support the conspiracy charge as it relates to Defendant Holloway as a co-conspirator.

Additionally, the evidence in this case establishes a pattern, scheme, or *modus operandi* of this sex trafficking organization, which is evident and will be reinforced by the testimony of each victim currently contained within in the Indictment—Victim 1, Victim 2, and Victim 3. Defense counsel's belief that a separate trial would silo the evidence from coming in regarding the overall

sex trafficking scheme is misplaced. Accordingly, severance would not mitigate any potential prejudice to Holloway of a single trial. *See United States v. Colhoff*, 833 F.3d at 983, 984 (8th Cir. 2016) ("Because evidence pertaining to both charges would have been admissible in separate trials, Colhoff also cannot show a reasonable probability that joinder affected the outcome of the proceedings.") (citing *United States v. Olano*, 507 U.S. 725 (1993)).

In any event, as the Eleventh Circuit has explained, most types of prejudice from a joint trial can and will be cured by limiting instructions. *See Lopez*, 649 F.3d at 1234. The potential prejudice to Holloway if she proceeds to trial alongside Chan and Foster who (presently) face more charges can be cured by a limiting instruction. As in every case, the jury will be clearly instructed that the United States must prove each element of the charges against Holloway beyond a reasonable doubt. Moreover, to the extent that Holloway is concerned about a potential "spillover" effect from the evidence related to Victim 1 and Victim 2, she can propose a limiting instruction for the Court's consideration. *See United States v. Kennard*, 472 F.3d 851, 859 (11th Cir. 2006) ("[A] court's cautionary instructions ordinarily will mitigate the potential 'spillover effect' of evidence of a co-defendant's guilty."). Accordingly, the proper remedy for this concern is a limiting instruction, not severance.

## IV.     CONCLUSION

In view of the foregoing, the United States respectfully submits that Defendant Holloway's Motion for Severance should be denied.

                                            Respectfully submitted,

                                            ARIANA FAJARDO ORSHAN
                                            UNITED STATES ATTORNEY

By:    /s/ J. Mackenzie Duane
           J. MACKENZIE DUANE
           Assistant United States Attorney
           Court No. A5502175
           99 N.E. 4th Street
           Miami, Florida 33132-2111
           Telephone: 305-961-9341
           Facsimile: 305-536-4699
           Email: mackenzie.duane@usdoj.gov

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the Court using CM/ECF.

*/s/ J. Mackenzie Duane*
J. Mackenzie Duane
Assistant United States Attorney
